# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: October 16, 2023

| | | |
|---|---|---|
| * * * * * * * * * * * * * | * | |
| TYRONE WILLIAM MAHAN, | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 22-880V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Vaccine Act § 16; Prison Mailbox Rule. |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * | * | |

Tyrone William Mahan, pro se, Carson City, MI, for Petitioner.
Alec Saxe, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING[1]

## I.    INTRODUCTION

On August 10, 2022, Tyrone William Mahan ("Petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2]  Petitioner alleged he sustained a shoulder injury related to vaccine administration ("SIRVA") "within (24) twenty-four hours" of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccination he received on August 5, 2019.  Petition at 2-3 (ECF No. 1).  In the alternative, Petitioner alleged he suffered from a Guillain-Barré Syndrome ("GBS") Table injury.  Id. at 1.  Lastly, Petitioner alleged he suffered complex regional pain syndrome

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-government Act of 2002.  **This means the Ruling will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018).  All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

("CRPS") caused by "mechanical trauma due to intramuscular injection[]" of the Tdap vaccination administered on August 5, 2019.  Id.

The undersigned issued an Order to Show Cause on August 29, 2022.  Order to Show Cause dated Aug. 29, 2022 (ECF No. 9).  The undersigned explained that upon review of Petitioner's petition, medical records, and other documents filed in this matter, it appeared that the petition was filed outside of the statute of limitations.  Id. at 1-2 (citing § 16(a)(2) ("[N]o petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury.")).  Specifically, Petitioner alleged that his symptoms began within 24 hours of his August 5, 2019 Tdap vaccination, placing onset on August 6, 2019.  Id. at 2.  However, Petitioner filed his Petition on August 10, 2022, more than "36 months after the date of the occurrence of the first symptom or manifestation of onset."  § 16(a)(2).

Thereafter, the undersigned sought briefing from the parties regarding the applicability of the prison mailbox rule.  Order dated Mar. 27, 2023 (ECF No. 15) (citing Houston v. Lack, 487 U.S. 266 (1988)).  The parties each filed a brief in May 2023.  Respondent's Brief Regarding the Applicability of the Prison Mailbox Rule ("Resp. Br."), filed May 9, 2023 (ECF No. 19); Petitioner's Brief in Response to the Special Master's Order for the Parties to Address Whether the "Prison Mailbox Rule" Applies to the Case ("Pet. Br."), filed May 19, 2023 (ECF No. 20).

This appears to be a case of first impression under the Vaccine Act.  Based on the reasons set forth below, the undersigned finds the prison mailbox rule applies to this case.

## II.    BACKGROUND

### A.    Procedural History

The petition was received and filed by the Clerk's office on August 10, 2022, along with medical records.  Petition; Petitioner's Exhibits ("Pet. Exs.") 1-4.  This case was assigned to the undersigned on August 12, 2022.  Notice of Reassignment dated Aug. 12, 2022 (ECF No. 8).

On August 29, 2022, the undersigned issued an Order to Show Cause, directing Petitioner to submit any evidence showing why his petition should not be dismissed for failure to file a timely action under § 16(a)(2).  Order to Show Cause at 1-2.

Thereafter, Petitioner filed a letter requesting information on the Vaccine Rules, procedures, and practices, and asking various questions.  Letter from Petitioner, filed Sept. 1, 2022 (ECF No. 10).  The undersigned provided the Vaccine Rules and a list of vaccine attorneys who practice in this Court, but noted she "[was] unable to provide legal assistance" to Petitioner.  Order dated Sept. 6, 2022 (ECF No. 11).

Petitioner filed a second letter on September 6, 2022.  Letter from Petitioner, filed Sept. 6, 2022 (ECF No. 12).  In the letter, Petitioner stated he contacted Respondent's counsel to settle his case and listed items of damages he was seeking from Respondent.  Id. at 1.  He added that he had suffered with his injury for three years without treatment.  Id.  Petitioner again asked the

undersigned for advice.  Id.  Lastly, he noted he would not be looking to retain an attorney to represent him.  Id.

Petitioner's third and final letter was filed on September 19, 2022, and was mailed in response to the undersigned's Order to Show Cause.  Letter from Petitioner, filed Sept. 19, 2022 (ECF No. 13) ("Letter").  Petitioner listed reasons why his claim should not be dismissed and filed additional supportive documents.  Id.

Thereafter, the undersigned directed to parties to file briefs regarding the applicability of the prison mailbox rule.  Order dated Mar. 27, 2023..  The parties each filed a brief in May 2023.  Resp. Br.; Pet. Br.

This matter is now ripe for adjudication.

**B.      Summary of Medical Records Related to Onset**[3]

Petitioner's pre-vaccination medical history includes a broken jaw, a seizure disorder, cocaine use disorder, schizoaffective disorder, bipolar, anxiety, degenerative disc disease of the lumbar and cervical spine, and post-traumatic stress disorder.  Pet. Ex. 2 at 14, 57 (ECF No. 1-4); Pet. Ex. 4 at 7 (ECF No. 1-6).  Prior to vaccination, on December 5, 2018, Petitioner received an unfavorable decision from the Social Security Administration regarding an alleged disability beginning January 1, 2006.  Pet. Ex. 4 at 2, 5 (ECF No. 1-6).  This application for supplemental security income and subsequent denial occurred prior to the vaccination at issue and is not related to Petitioner's alleged vaccine-related injury.

On August 5, 2019, Petitioner saw registered nurse ("RN") Tammie Gibson.  Pet. Ex. 2 at 36 (ECF No. 1-4).  Petitioner reported his bed fell on his leg that day, injuring his left leg, foot, and ankle.  Id. at 36-37.  Petitioner reported pain of 7/10, pain with movement, decreased range of motion and weakness due to pain, and tingling in his toes.  Id.  He had no complaints of back pain.  Id. at 36.  Physical examination revealed Petitioner's leg, ankle, and foot near his first toe were tender to palpation.  Id.  Swelling and a superficial abrasion on the back of his leg were noted.  Id.  Crutches were ordered.  Id. at 11, 37.  Petitioner received the Tdap vaccine at issue during this visit.  Id. at 37-38.

The following day, on August 6, 2019, Medical Assistant ("MA") Amy E. Cook, wrote Petitioner was "carrying his crutches and walking without using the crutches to medical.  When in medical[4] he didn't use them he was carrying them."  Pet. Ex. 2 at 12 (ECF No. 1-4).

---

[3] The undersigned has reviewed all of Petitioner's medical records, but only summarizes those pertinent to onset of Petitioner's alleged vaccine-related injury.

[4] There is no documentation showing that Petitioner went to medical on August 6, 2019.

From August 8 to August 12, 2019, Petitioner was prescribed 50mg of Ultram.[5]  Pet. Ex. 2 at 13 (ECF No. 1-4).  It is unclear why Ultram was prescribed, whether it was to treat Petitioner's left leg, foot, and ankle injury, Petitioner's alleged vaccine-related injury, or another injury.

On August 9, 2019, Petitioner presented for a medical clearance physical.  Pet. Ex. 2 at 14 (ECF No. 1-4).  History of present illness noted intake history and physical were completed on July 25, 2019.  Id.  Petitioner was informed that he was approved for a sleep study due to sleep apnea.  Id.  X-rays of Petitioner's lower left leg, left foot, and left ankle were ordered on August 6, 2019, and Petitioner reported they were conducted on August 9, 2019.  Id.

On August 18, 2019, Petitioner scheduled a call with Mary A. Gratz, RN, for August 19, due to complaints of "lasting pain," "lasting dysfunction of [his] arm," and a "burning sensation" from his August 5, 2019 Tdap vaccine.  Pet. Ex. 1 at 10 (ECF No. 1-3).  The record also stated, "Details: I received a tetanus shot on 8/5/19.  Is it normal to have lasting pain?"  Id.

The following day, August 19, 2019, Petitioner was seen by Devin G. Linderman, RN.  Pet. Ex. 2 at 22 (ECF No. 1-4).  Nurse Linderman documented that Petitioner stated, "I got a tetanus shot on 8/5/19 and I've been having lasting pain in the arm with tingling and burning sometimes."  Id.  Date of onset was documented as August 11, 2019.  Id.  Petitioner complained of "tingling and pins and needles [that] started occurring" after his Tdap vaccination on August 5, 2019.  Id.  Petitioner reported "moderate tenderness, moderate pain with movement, muscle strength full [bilateral upper extremities], full [range of motion], no redness, minimal warmth to touch, [and] no current numbness."  Id.  He also reported the generalized soreness in his left deltoid was a 5/10 and a burning sensation was a 7/10.  Id.  Objective examination of his left arm revealed Petitioner's left arm was tender and painful with movement, but there was no weakness, tingling, numbness, or swelling and normal range of motion.  Id.  Petitioner was given an ice pack for two days, and was directed to have a re-evaluation done on August 22, 2019.  Id. at 23.

Petitioner underwent a sleep study on August 21, 2019.  Pet. Ex. 2 at 17-20 (ECF No. 1-4).  There is no documentation of any complaints of shoulder, arm, or hand pain from Petitioner's Tdap vaccine.

Petitioner returned to Nurse Linderman on August 22, 2019.  Pet. Ex. 2 at 25 (ECF No. 1-4).  Petitioner reported "[his] arm [was] doing better."  Id.  Physical examination of the left shoulder was normal.  Id.  Nurse Linderman wrote "[Petitioner] [was] no longer having any concerns with injection area.  [Petitioner] report[ed] minimal discomfort with [left] deltoid currently, no burning sensation, [and] no tingling."  Id.  Nurse Linderman added that "[Petitioner] voiced he had no medical, mental, or general concerns at this time" and "[Petitioner] voiced no complaints."  Id. at 27.

---

[5] Ultram, a trademark for tramadol hydrochloride, is "an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery."  Ultram, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id= 51748 (last visited Oct. 2, 2023); Tramadol Hydrochloride, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=50542 (last visited Oct. 2, 2023).

In a Kite Response[6] dated September 4, 2019, taken by Melissa M. Schulz, RN, Petitioner reported "[p]ain in left arm continuous pain since tetanus dip[h]theria."  Pet. Ex. 2 at 28 (ECF No. 1-4).  He was seen by Nurse Gratz later that day.  Id. at 29.  Date of onset was documented as August 5, 2019.  Id.  Petitioner stated, "I got a tetanus about a month ago and my arm still hurts.  It still hurts its been a month."  Id.  Physical examination revealed Petitioner's left arm was tender.  Id.  No weakness, tingling, or numbness was documented on examination, and Petitioner's "muscle strength [was] good."  Id.  Nurse Gratz noted the "[a]rea [was] not swollen" and there was "no redness."  Id.  She found "[n]o explanation for [Petitioner] to have continued pain in arm."  Id.  Nurse Gratz instructed "[Petitioner] to do [range of motion] exercises and give it time to heal," and to come back in October if he still had pain.  Id. at 30.

On September 11, 2019, Petitioner submitted a Kite Response, noting he had been seen "numerous times about the dysfunction of [his] left ar[m] after rec[eiving] a tetanus" vaccine, and requesting a discussion to remove a metal plate in his jaw.  Pet. Ex. 2 at 32 (ECF No. 1-4).

Petitioner initiated two Kite Responses in October 2019.  The first was submitted on October 7, 2019, and Petitioner reported his arm was "constantly in pain and sometimes dysfunctional."  Pet. Ex. 1 at 11 (ECF No. 1-3).  He requested help on how to treat his arm that was "still sore from a tetanus shot on 8/5."  Id. at 11-12.  Petitioner was instructed by Nurse Christina Russell to "[u]se a warm compress and continue to work the muscle."  Id. at 11.  She added the soreness will go away [and] it can take a couple weeks."  Id.

The next day, October 8, 2019, Petitioner submitted another Kite Response, asking "what to do about my left arm that is still sore from a tetanus shot on 8/5."  Pet. Ex. 1 at 12 (ECF 1-3).

On November 10, 2019, Petitioner called in a Kite Response, reiterating his continued pain and dysfunction in his left arm.  Pet. Ex. 1 at 13 (ECF No. 1-3).  He stated, "I've kited since 8-5-19 concerning my tetanus shot."  Id.  Petitioner was instructed to come in and see a nurse. Id.  On November 21, 2019, Petitioner requested a nurse sick call for "[p]ain and dysfunction in left arm after tetanus shot on 8-5-19."  Id. at 14.

Petitioner saw Patricia F. Ruggiero, RN, on November 30, 2019.  Pet. Ex. 2 at 33 (ECF No. 1-4).  Petitioner reported 8/10 pain in his left upper arm.  Id.  Nurse Ruggiero's date of onset was August 9, 2019.  Id.  Nurse Ruggiero documented that Petitioner "states that he has been having pain in his left deltoid since his tetanus shot in August."  Id.

Petitioner reported "[s]tretching his arm makes it worse" and his arm swells at least twice daily.  Pet. Ex. 2 at 33 (ECF No. 1-4).  Physical examination revealed tenderness and pain with movement.  Id.  Petitioner was ordered to apply warm compress three times per day to his left arm since icing his arm was not effective.  Id. at 15, 33.  Petitioner was also referred to provider,

---

[6] A Kite Response is a written request for something within the jail or prison system, including requests for medical care.  Jeffrey E. Keller, One Word Docs Need to Know in Prison, MedPage Today (Aug. 9, 2018), https://www.medpagetoday.com/opinion/doing-time/74491.

Frederic E. Herro, M.D.  Id. at 33.  By December 6, 2019, Nurse Practitioner ("NP") Natalya E. Stokely-Hamdan directed Petitioner to ice three times per day.  Id. at 16.

On December 22, 2019, Petitioner, in a health care request, wrote that "[s]ince 8-5-19 I've been in pain in my left shoulder area after a Tetanus shot was administered."  Pet. Ex. 1 at 8 (ECF No. 1-3).  Petitioner complained of continued "severe pain, weakness[,] and dysfunction of [his] left shoulder and arm."  Id.  The following day, on December 23, 2019, Petitioner submitted a Kite Response, reporting again that "[s]ince 8-5-19 I've been in pain in my left shoulder area after a tetanus shot was administrated."  Id. at 15.  Petitioner was instructed to come in and see a nurse, which was required before getting a referral to an NP.  Id.

On January 14, 2020, Petitioner saw Nurse Stokely-Hamdan and was given 325mg of acetaminophen to take three times daily for his left shoulder pain.  Pet. Ex. 2 at 34 (ECF No. 1-4).

Petitioner submitted a Kite Response on January 28, 2020.  Pet. Ex. 1 at 19 (ECF No. 1-3).  He described pain in his left shoulder and arm "from a tetanus shot received on 8-5-19."  Id.  He had difficulty "grasp[ing] objects with hand due to pin needle sensation[,] pain[,] and weakness in the arm/hand."  Id.  He stated previous visits to nurses and nurse practitioners had not helped.  Id.

In an undated handwritten note on the record from January 28, 2020, which appears to have been written by Petitioner, he stated, "I received TDAP vaccine 8-15-19 L[eft] shoulder at 2:35pm complained of burning pain & numbness on 8-6-19 also on 8-7-19 effecting shoulder/arm and hand."  Pet. Ex. 1 at 19 (ECF No. 1-3).  Petitioner reported he has experienced this reaction "for almost 2 years."  Id.

On February 14, 2020, Petitioner submitted a health care request, complaining of an "injury triggered from a [] Tetanus administration."  Pet. Ex. 1 at 6 (ECF No. 1-3).  He reported he "continue[d] to experience pain and weakness in [his] left arm/shoulder and hand."  Id.  He stated the pain was sometimes extreme and pain medication had not improved his condition.  Id.

Petitioner repeated his concerns the following week, on February 28, 2020.  Pet. Ex. 1 at 7, 17 (ECF No. 1-3).  And on March 29, 2020, in a Kite Response, Petitioner stated he was "in extreme pain constantly in [his] left shoulder that has given [him] a problem after a tetanus shot 8/5/19."  Id. at 18.  A specialist was contacted regarding Petitioner's condition.  Id.

Petitioner submitted a Kite Response, on October 12, 2020, complaining of an adverse effect to the Tdap vaccine administered on August 5, 2019.  Pet. Ex. 1 at 9 (ECF No. 1-3).  He complained of continued "weakness in arm, dysfunction (occasionally)[,] and a severe burning numbing pain in [his] left upper-shoulder."  Id.

On January 8, 2021, Petitioner submitted a health care request.  Pet. Ex. 1 at 4 (ECF No. 1-3).  Petitioner wrote, "[f]or over a [year], I have been given [T]ylenol for an arm injury that occurred from a tetanus shot administ[ered] 8-5-19."  Id.  Petitioner complained about not seeing

a medical provider[7] for over a year.  Id.  Petitioner submitted a Kite Response on January 12, 2021, reiterating the same complaints.  Id. at 20.  Petitioner was told that "[d]ue to the State of Emergency in Michigan, health care [was] only seeing urgent/emergent appointments" at the time.  Id.  Petitioner was instructed to contact health care immediately if his situation became urgent/emergent.  Id.  Petitioner submitted a Kite Response the following day, January 13, 2021, complaining of chronic pain in his arm from his vaccine.  Id. at 21.  Petitioner was given the same instructions.  Id.

In a health care request dated January 29, 2021, Petitioner requested to see a medical provider "for this urgent injury to [his] arm after a [tetanus] shot given 8-5-19."  Pet. Ex. 1 at 5 (ECF No. 1-3).  He complained that "[t]he injury keeps [him] in constant pain and [he] ha[s] dysfunction in [his] left shoulder/arm," including "lack of strength and rotation of the arm."  Id.

Petitioner saw Crystal Wood, RN, on February 15, 2021.  Pet. Ex. 2 at 10 (ECF No. 1-4).  Only one of three pages of this visit was filed.  Id.  Assessment was "acute pain."  Id.

On March 31, 2021, Petitioner saw Erin Griffith, NP, and was given 325mg of acetaminophen to take three times daily for "[p]ain in left upper arm."  Pet. Ex. 2 at 9 (ECF No. 1-4).

Petitioner presented to Nurse Griffith on April 28, 2021, complaining of a headache.  Pet. Ex. 2 at 4 (ECF No. 1-4).  Petitioner also complained of "a 'vaccine injury' from a Tdap immunization in 2019. . . .  He state[d] he has continued arm pain and decreased movement of his shoulder."  Id.  Musculoskeletal examination revealed normal passive range of motion and tenderness.  Id. at 5.  An X-ray of Petitioner's left shoulder and physical therapy were ordered.  Id. at 6.  On June 4, 2021, Nurse Griffith reviewed the shoulder X-ray[8] and found it to be normal.  Id. at 52.

Petitioner had a telephone encounter with Nurse Griffith on June 14, 2021.  Pet. Ex. 2 at 49 (ECF No. 1-4).  Petitioner's headaches continued.  Id.  He also "[c]omplain[ed] of continued numbness, burning[,] and tingling in left hand," with "new complaint of weakness in left hand."  Id.  Petitioner was "concerned about nerve damage."  Id.  Nurse Griffith ordered an electromyography ("EMG") of the left upper extremity.  Id. at 50.

The EMG evaluation was performed on September 2, 2021 by Dr. Michael Andary, M.D., Attending and Professor at Michigan State University, and Resident Dr. Alex Doubek, D.O.  Pet. Ex. 2 at 57 (ECF No. 1-4).  Dr. Andary and Dr. Doubek summarized Petitioner's history of present illness and wrote Petitioner "[s]tate[d] he had a tetanus shot in August 2019 and [] his left lateral elbow pain became worse the day after."  Id.  Physical examination revealed

---

[7] Specifically, Petitioner stated "MP."  It is not clear whether Petitioner meant NP (Nurse Practitioner) or medical provider.

[8] Documentation from the X-ray, indicating the date it was conducted or the radiologist's report, were not provided.

Tinel's[9] over the wrist pain in elbow and Tinel's over elbow pain in elbow with some radiation of pain into D4 and D5 on left side.  Id.  Petitioner reported pain with left wrist extension and pain into the elbow.  Id.  Dr. Doubek also found "Spurling's[10] caused pain in the neck, but no radiation down either arm."  Id.  Dr. Andary reviewed this test and noted "some cold sensation in the left D5."  Id.  Lastly, Petitioner was positive for Babinski[11] downgoing bilaterally and Hoffman's[12] was absent bilaterally.  Id.  Nerve conduction study ("NCS")/EMG was interpreted as showing "mild left carpal tunnel syndrome with no axon loss."  Id. at 60.  Dr. Andary and Dr. Doubek recommended management with non-operative care for the left mild carpal tunnel syndrome.  Id.  They also explained "the dysesthesias in the little finger [was] probably not explained by the carpal tunnel syndrome."  Id.  No evidence of ulnar neuropathy or cervical radiculopathy causing the numbness was found.  Id.

Petitioner saw Krystal Bryant, NP, on October 28, 2021 to discuss the EMG results.  Pet. Ex. 2 at 43 (ECF No. 1-4).  Petitioner was given a brace for his left wrist for treatment of his carpal tunnel.  Id.  Physical examination was positive for tenderness and decreased range of motion.  Id. at 44.  A request for a computerized tomography ("CT") scan was placed.  Id. at 47, 56. A request for physical therapy was also placed on November 2, 2021.  Id. at 42.

On November 24, 2021, Petitioner returned to Nurse Bryant for his pain.  Pet. Ex. 2 at 41 (ECF No. 1-4).  "[Petitioner] went to [a physical therapist] who recommended a steroid pack,"[13] which Petitioner "ha[d] been taking [] with no relief."  Id.

---

[9] Tinel sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve." Tinel Sign, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/ definition?id=106510 (last visited Oct. 2, 2023).

[10] A Spurling test indicates cervical radiculopathy when a patient exhibits "pain radiating into the upper limb ipsilateral to a rotation position of the head."  Spurling Test, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=112983 (last visited Oct. 2, 2023).

[11] The Babinski reflex is "dorsiflexion of the big toe on stimulating the sole of the foot" that is "a sign of a lesion in the central nervous system."  Babinski Reflex, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=102809 (last visited Oct. 2, 2023).

[12] "The Hoffman sign is an involuntary flexion movement of the thumb and or index finger when the examiner flicks the fingernail of the middle finger down.  The reflexive pathway causes the thumb to flex and adduct quickly.  A positive Hoffman sign indicates an upper motor neuron lesion and corticospinal pathway dysfunction likely due to cervical cord compression."  Eric Whitney & Sunil Munakomi, Hoffman Sign, StatPearls, https://www.ncbi.nlm.nih.gov/books/ NBK545156/ (last updated Oct. 24, 2022).

[13] The record from this visit was not filed.

Petitioner received a left Kenalog[14] (40mg) shoulder injection on December 15, 2021. Pet. Ex. 2 at 39 (ECF No. 1-4).

No additional medical records have been filed.

### C.    Dates Petitioner's Filings in This Case Were Mailed and Received

Petitioner signed his Petition and certificate of service on August 3, 2022.  Petition at 3. A pink receipt[15] indicating the day on which Petitioner provided this filing to prison staff was not provided.  According to the envelope containing Petitioner's petition, the petition was mailed on Friday, August 5, 2022, and received and stamped filed by the Office of the Clerk of the U.S. Court of Federal Claims on Wednesday, August 10, 2022.  ECF No. 1-7.

Petitioner next mailed a letter received by the Office of the Clerk of the U.S. Court of Federal Claims on September 1, 2022.  Letter from Petitioner, filed Sept. 1, 2022, at 2 (ECF No. 10).  It is not clear when Petitioner provided this letter to prison staff as a pink receipt was not provided.  See id. at 1-2.  However, the envelope indicated this letter was mailed on August 25, 2022.  Id. at 2.

Petitioner's second letter was dated August 29, 2022.  Letter from Petitioner, filed Sept. 6, 2022, at 1 (ECF No. 12).  Because a pink receipt indicating the day on which Petitioner provided this filing to prison staff was not provided, this date is not clear.  See id. at 1-2.  This letter was mailed by prison staff on August 30, 2022, and received and stamped filed by the Office of the Clerk of the U.S. Court of Federal Claims on September 6, 2022.  Id. at 2.

Petitioner's third letter, which also contained supporting documentation, was not dated, and it is not clear when the letter was provided to prison staff, as a pink receipt was not provided. See Letter.  According to the envelope, prison staff mailed this letter and accompanying documentation on September 13, 2022 and it was received and stamped filed by the Office of the Clerk of the U.S. Court of Federal Claims on September 19, 2022.  Id. at 11.

Lastly, Petitioner mailed a letter indicating a change of address.  Notice of Change of Address, filed Nov. 7, 2022 (ECF No. 14).  The date on which Petitioner wrote this letter and provided it to prison staff was not indicated.  See id.  Prison staff mailed this matter on October 31, 2022, and it was received and stamped filed by the Office of the Clerk of the U.S. Court of Federal Claims on November 7, 2022.  Id. at 2.

---

[14] Kenalog (Triamcinolone) is a corticosteroid used to treat inflammation.  Triamcinolone (Injection Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/triamcinolone-injection-route/description/drg-20074674 (last updated May 1, 2023).

[15] These "pink receipts" are entitled "Disbursement Authorization (Expedited Legal Mail – Prisoner)" and are copies of a prisoner's legal mail, confirming when, where, and what was filed.

### D.      Parties' Contentions

#### 1.      Petitioner's Contentions

In his petition, Petitioner alleged that on August 5, 2019, he was given a tetanus vaccine and "within (24) twenty-four hours[,] [he] had a[n] adverse effect." Petition at 2.  He also stated "[t]he vaccine injury happened [in] less than 24 [hours]." Id. at 3.  Petitioner described the symptoms as numbness in his arm, burning sensation, and weakness in his left hand.  Id. at 2.

Petitioner also submitted a letter, received and marked filed on September 19, 2022, in which he discussed problems with sending mail from prison.  See Letter at 1.  Petitioner explained that prison staff do not immediately send out mail.  Id.  In support of this statement, Petitioner filed "pink receipts that [he] sent to lawyers, courts[,] and government officials that [show that it took] (6) days [for mail] to be mailed out." Id.  He explained that it often took six days for mail to be sent out from the prison facility.  Id.

Four pink receipts[16] were submitted by Petitioner on Friday, February 25, 2022, and were placed in outgoing mail five days later on Wednesday, March 1, 2022.  Letter at 6-8, 10.  The fifth pink receipt[17] was submitted by Petitioner on Tuesday, July 5, 2022 and placed in outgoing mail on Wednesday, July 6, 2022, one day later.  Id. at 9.

According to Petitioner, "[i]n April, [his] prison was on Covid-19 protocol [and] no mail [went] out." Letter at 1 (ECF No. 13).  Petitioner did not specify what year this occurred, or the period of time that mail did not go out due to the prison's Covid-19 protocol.  See id.  Additionally, in May 2022, the prison was on quarantine due to a scabies outbreak.  Id.  Attached to the Letter are emails evidencing a scabies outbreak on May 13, 2022.  Id. at 3.  The first dose of treatment for scabies was administered on May 24, 2022.  Id. at 4.  The second dose was to be administered seven days after the first treatment.  Id.  After a period of 24 hours, units were to resume to normal operations after receiving clean clothing and a new bed roll.  Id.  Although the exact period of time that mail was not sent out of the facility is unclear, based on information provided by Petitioner, the quarantine due to the scabies outbreak would have concluded approximately June 1.

Additionally, Petitioner wrote, "Michigan has a[n] in the mail policy meaning if it was in staff hands before your filing date [then] that was acceptable." Letter at 1.  Petitioner contends he gave his petition "to staff at least 6 days in advance but the prison went on shut down twice due to disease." Id.  It is not clear whether these two shut downs are the shutdowns mentioned above in April and May 2022, or different shutdowns due to disease.

---

[16] These pink receipts indicate Petitioner's mail was sent to the Lieutenant Governor of Michigan, Michigan State Capitol, Clerk of Court of the U.S. District Court in Detroit, Michigan, and Attorney Frank Lawrence in Michigan.  Letter at 6-8, 10.

[17] This pink receipt indicated Petitioner's mail was sent to the U.S. District Court in Detroit, Michigan.  Letter at 9.

In his brief, Petitioner states he "placed the [petition] in prison officials hands before the August 6, 2022 deadline." Pet. Br. at 1. He also filed a declaration with his brief in which he avers that "[o]n August 5, 2022 or before, I gave the petition for compensation of a vaccine injury to prison officials for timely filing." Id. at 5. For further support, he cites to cases that have discussed the prison mailbox rule. Id. at 2 (citing, e.g., Douglas v. Noelle, 567 F.3d 1103, 1108-09 (9th Cir. 2009) (holding that the Houston prison mailbox rule applies to § 1983 suits filed by pro se prisoners and that it applied in their case where Petitioner provided a photocopy of the envelope in which his complaint was sent showing the date in which it was postmarked)).

### 2.    Respondent's Contentions

Respondent argues the prison mailbox rule does not apply to Vaccine Program cases because it is incompatible with the Vaccine Rules, specifically Rule 17, which "make clear that a paper petition is filed when it is received and marked filed by the clerk of the Court of Federal Claims, not when mailed." Resp. Br. at 10. Thus, Respondent asserts the prison mailbox rule is inapplicable. Id. And even if it were applicable, Respondent contends that the rule would not apply here "as there is insufficient record evidence showing that [P]etitioner delivered his petition to prison officials prior to the August 6, 2022 filing deadline." Id.

In support of his position, Respondent cites to the Vaccine Act and Vaccine Rules. Resp. Br. at 3-4. For an alleged vaccine-related injury arising from a vaccination administered after October 1, 1988, "no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury." Id. at 3 (quoting § 16(a)(2)). Respondent cites Vaccine Rule 17, which dictates that nonelectronic filings—i.e., paper filings—are "filed by delivering it to the clerk." Id. at 3-4 (quoting Vaccine Rule 17(b)(2)). Vaccine Rule 17 further states "[a] document in paper form is filed when it is received and marked filed by the clerk, not when mailed." Vaccine Rule 17(b)(4). Respondent contends these Rules are binding on the Court. Resp. Br. at 4 (citing e.g., M.A. Mortenson Co. v. United States, 996 F.2d 1177, 1183-84 (Fed. Cir. 1993)).

Next, Respondent distinguishes cases in which the prison mailbox rule preserved a filing deadline from the facts of this case. Resp. Br. at 5-8. The Supreme Court in Houston found a pro se prisoner's notice of appeal was "filed . . . at the moment it [was] delivered to prison officials for forwarding to the clerk of the district court." 487 U.S. at 272. Respondent explains that in that case, the Supreme Court noted their statute

> [did] not define when a notice of appeal has been "filed" or designate the person with whom it must be filed, and nothing in the statute suggests that, in the unique circumstances of a pro se prisoner, it would be inappropriate to conclude that a notice of appeal is "filed" within the meaning of § 2107[18] at the moment it is delivered to prison officials for forwarding to the clerk of the district court.

---

[18] See infra Section III.C.

Resp. Br. at 5 (quoting <u>Houston</u>, 487 U.S. at 272).  The Supreme Court further "explained that none of the rules governing the time for filing a notice of appeal were 'dispositive' on the question, for none 'set[] forth criteria for determining the moment at which the 'filing' has occurred.'"  <u>Id.</u> (quoting <u>Houston</u>, 487 U.S. at 273).

Respondent argues this case is different than <u>Houston</u>.  Resp. Br. at 5.  According to Respondent, the Vaccine Act and Vaccine Rules have defined when a petition is timely filed, which is when it is received by the Clerk at the Court of Federal Claims, unlike the statute and rules applicable in <u>Houston</u>, which "were silent on the question of when a notice of appeal is actually filed."  <u>Id.</u> at 5-6.  Thus, "'filed' within the meaning of [§ 16(a)(2)[19]] and Vaccine Rule 17[][20] cannot be read in a way that both accounts for potential delays caused by prison officials while also preserving the clear meaning and mandatory nature of Vaccine Rule 17."  <u>Id.</u> at 5.  "If this Court were to read 'filed' expansively to include the date [P]etitioner delivered his petition to prison officials for forwarding to the clerk, it would be redefining the meaning of 'filed,' contrary to the definition provided in Vaccine Rule 17."  <u>Id.</u> at 5-6.

Next, Respondent acknowledges that the Court of Federal Claims in <u>Sharpe v. United States</u> wrote that "[s]ince <u>Houston</u>, the trend in federal courts appears to be toward extending the prison mailbox rule to all <u>pro se</u> prisoner district court filings."  Resp. Br. at 6 (quoting <u>Sharpe v. United States</u>, 111 Fed. Cl. 334, 336 (2013)).  However, Respondent argues that "[t]he Supreme Court in <u>Houston</u> did not establish a universal prison mailbox rule," and various federal courts, including the Supreme Court, have declined to apply the rule where relevant statutes, rules, or regulatory schemes provide a contrary definition.  <u>Id.</u> (citing, e.g., <u>Smith v. Conner</u>, 250 F.3d 277, 278-79 (5th Cir. 2001) (explaining that <u>Houston</u> "did not announce a universal rule for prisoner filings," and merely "interpreted an undefined term"); <u>Fex v. Michigan</u>, 507 U.S. 43 (1993); <u>Nigro v. Sullivan</u>, 40 F.3d 990, 995 (9th Cir. 1994)).

Respondent argues the Supreme Court decision in <u>Fex</u> "best underscores the importance of scrutinizing the text and structure of the statutory provision or rule at issue and not elevating policy considerations over clear procedural rules."  Resp. Br. at 6-7.  As Respondent explains, the Supreme Court in <u>Fex</u> rejected a prisoner's argument that delivery of his notice to the warden was sufficient because they determined it was not consistent with the statutory language.  <u>Id.</u> at 7 (citing <u>Fex</u>, 507 U.S. at 48-49).  Respondent contends that <u>Fex</u> and others provide that "courts must 'look at the statutory and regulatory regimes[] . . . in deciding whether to apply the [prison mailbox] rule.'"  <u>Id.</u> (quoting <u>Longenette v. Krusing</u>, 322 F.3d 758, 765 (3d Cir. 2003)) (citing <u>Smith</u>, 250 F.3d at 279 ("The Supreme Court [in <u>Fex</u>] has [] emphasized that when the language of the governing rule clearly defines the requirements for filing, the text of the rule should be enforced as written."); <u>Nigro</u>, 40 F.3d at 995 ("<u>Fex</u> instructs that <u>Houston</u> policies cannot override the plain meaning of a procedural rule.")).

With regard to the Federal Circuit decision in <u>Bernaugh v. United States</u>, which applied the prison mailbox rule to an incarcerated <u>pro se</u> plaintiff's motion for reconsideration,

---

[19] <u>See</u> <u>infra</u> Section III.A.

[20] <u>See</u> <u>infra</u> Section III.B.2.

Respondent argues the decision was unpublished, did not involve the Vaccine Program, and was easily distinguishable from this case.  Resp. Br. at 8 (citing 168 F.3d 1319 (Fed. Cir. 1998) (unpublished table decision)).  The Federal Circuit in <u>Bernaugh</u> determined "a prisoner's submission may be deemed filed with the court when it has passed into the control of the prison officials."  <u>Bernaugh</u>, 168 F.3d at 1319.  Respondent argues that there was no rule defining "filed" for motions for reconsideration, and thus, the applicability of the prison mailbox rule in <u>Bernaugh</u> "made sense."  Resp. Br. at 8.  But here, there is a rule defining when pleadings and other papers are "filed," which is "when they are 'received and marked filed by the clerk, not when mailed.'"  <u>Id.</u> (quoting Vaccine Rule 17(4)(A)).  Respondent concludes that <u>Bernaugh</u> and the prison mailbox rule therefore do not apply here.  <u>Id.</u>

Lastly, Respondent argues that even if the prison mailbox rule applied to Vaccine Program cases, it would not apply here "because the record contains no evidence that [P]etitioner delivered his petition to prison officials prior to the August 6, 2022 filing deadline."[21]  Resp. Br. at 8-9.  Respondent notes none of the evidence submitted by Petitioner supports Petitioner's assertion that he provided prison staff with his petition in advance of the filing deadline.  <u>Id.</u>  Respondent acknowledges the pink receipts filed by Petitioner show his mail was given to prison officials several days before the mail was placed in outgoing mail, but argues that "none of these pink receipts correspond to mail [including the petition] sent to the [C]lerk of the Court of Federal Claims."  <u>Id.</u> at 9.

Additionally, Respondent argues "[P]etitioner's implied assertion that prison officials were delayed in mailing his documents due to prison shutdowns based on COVID-19 and scabies outbreaks in April 2022 and May 2022, respectively, does not explain why his petition for compensation under the Vaccine Act, due in August 2022, would have been delayed."  Resp. Br. at 9.  Respondent concludes that "[w]ithout further elaboration from [P]etitioner on his September 19, 2022 letter, or the submission of additional evidence in support of his assertion that he gave his petition to prison officials prior to the filing deadline, there is insufficient evidence to apply the prison mailbox rule here."  <u>Id.</u>

## III.    LEGAL FRAMEWORK

### A.    Vaccine Act

Section 11(a)(1) of the Vaccine Act states "[a] proceeding for compensation under the Program for a vaccine-related injury or death shall be initiated by . . . the filing of a petition . . . with the United States Court of Federal Claims."

Section 16(a)(2) of the Vaccine Act governs claims resulting from vaccines administered after October 1, 1988, and reads,

> if a vaccine-related injury occurred as a result of the administration of such

---

[21] Because the envelope containing Petitioner's petition is postmarked August 5, 2022, it is clear Petitioner gave his petition to prison officials on or before August 5, 2022, thus negating this argument by Respondent.  <u>See</u> ECF No. 1-7.

vaccine, no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury.

§ 16(a)(2).  Therefore, the statute of limitations begins to run from the date of "the first symptom or manifestation of onset" of the alleged vaccine-related injury.  The statute of limitations begins to run from the onset of the first objectively cognizable symptom, whether or not that symptom is sufficient for diagnosis.  Carson v. Sec'y of Health & Hum. Servs., 727 F.3d 1365, 1369 (Fed. Cir. 2013).

Special masters have appropriately dismissed cases that were filed outside the limitations period, even by a single day or two.  See, e.g., Spohn v. Sec'y of Health & Hum. Servs., No. 95-0460V, 1996 WL 532610, at *3 (Fed. Cl. Spec. Mstr. Sept. 5, 1996) (dismissing case filed one day beyond the 36-month limitations period), aff'd, 132 F.3d 52 (Fed. Cir. 1997); Clubb v. Sec'y of Health & Hum. Servs., No. 15-891V, 2017 WL 7310150, at *4 (Fed. Cl. Spec. Mstr. Aug. 15, 2017) (same), mot. for review denied, 136 Fed. Cl. 255; Huntoon v. Sec'y of Health & Hum. Servs., No. 21-1965V, 2023 WL 2231842, at *2-4 (Fed. Cl. Spec. Mstr. Feb. 27, 2023).

## B.   Vaccine Rules

### 1.   Vaccine Rule 2: Commencing an Action

Under the Vaccine Rules, "[a] proceeding for compensation under the Vaccine Act is commenced by filing a petition with the United States Court of Federal Claims."  Vaccine Rule 2(a).

Vaccine Rule 2 adds that for a "paper form" of a petition, "Petitioner must forward . . . the petition . . . by mail or other delivery[] to:

Clerk
United States Court of Federal Claims
717 Madison Place, NW
Washington, DC 20439."

Vaccine Rule 2(b)(1).

### 2.   Vaccine Rule 17: Serving and Filing Papers After the Petition

Vaccine Rule 17 governs "serving and filing papers after the petition."  Similar to Vaccine Rule 2, Vaccine Rule 17(b)(2) states "[a] paper not filed electronically is filed by delivering it to the clerk at the address provided in Vaccine Rule 2."  Vaccine Rule 17(b)(2).

Vaccine Rule 17(b)(4) is a section entitled "filing defined."  This rule states that "[a] document in paper form is filed when it is received and marked filed by the clerk, not when mailed."  Vaccine Rule 17(b)(4)(A).

### 3.      Vaccine Rule 1: Scope of Rules

Vaccine Rule 1(b) governs "matters not specifically addressed by the Vaccine Rules," specifically stating that "[i]n any matter not specifically addressed by the Vaccine Rules, the special master or the court may regulate the applicable practice, consistent with these rules and with the purpose of the Vaccine Act, to decide the case promptly and efficiently."  Vaccine Rule 1(b).

Vaccine Rule 1(c) provides that the Rules of the Court of Federal Claims ("RCFC") "apply only to the extent they are consistent with the Vaccine Rules."  Vaccine Rule 1(c).

### 4.      Rules of the Court of Federal Claims

#### a.      RCFC 3: Commencing an Action

RCFC 3, like Vaccine Rule 2, states "[a] civil action is commenced by filing a complaint with the court."  RCFC 3.  RCFC 3 does not prescribe a method for filing.

#### b.      RCFC 5: Serving and Filing Pleadings and Other Papers

RCFC 5 governs "serving and filing pleadings and other papers."  However, unlike Vaccine Rule 17, which governs "serving and filing papers after the petition," RCFC 5 governs the filing of "pleadings," which consist of a complaint (the equivalent of a Vaccine petition) as well as other specific filings thereafter.  See RCFC 5, 7.  RCFC 5(d)(2), which deals with nonelectronic filings, or paper filings, states "[a] paper not filed electronically is filed by delivering it [] to the clerk."[22]  RCFC 5(d)(2).

### C.      Case Law

#### 1.      Prison Mailbox Rule

The Supreme Court in Houston established the prison mailbox rule.  487 U.S. 266.  The Petitioner in Houston provided his pro se notice of appeal of his habeas corpus petition to prison officials 27 days after judgment.  Id. at 268.  The notice of appeal was marked "filed" by the district court 31 days after judgment, one day after the expiration of the filing period for an appeal under the Federal Rule of Appellate Procedure 4(a)(1).  Id. at 268-69.

The statute and rules at issue in Houston were 28 U.S.C. § 2107 and Federal Rules of Appellate Procedure 3(a) and 4(a)(1).  Houston, 487 U.S. at 272.  Section 2107 stated "[n]o appeal shall bring any judgment, order or decree in an action, suit or proceeding of a civil nature before a court of appeals for review unless notice of appeal is filed, within thirty days after the

---

[22] The Rules Committee Notes for the 2002 Revision of RCFC 5 specifies that "[f]iling is not complete on mailing" and is controlled by RCFC 5(d).

entry of such judgment, order or decree." Id.  The Court determined the statute did not define when a notice of appeal was "filed" or designate with whom it must be filed.  Id.

Rule 3(a) provided that an appeal "shall be taken by filing a notice of appeal with the clerk of the district court within the time allowed by Rule 4." Houston, 487 U.S. at 272.  Rule 4(a)(1) provided "the notice of appeal required by Rule 3 shall be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from." Id.  The Supreme Court determined these two rules "specify that the notice should be filed 'with the clerk of the district court,'" which was not in dispute. Id. at 272-73.

At issue was the "question . . . of timing, not destination: whether the moment of 'filing' occurs when the notice is delivered to the prison authorities or at some later juncture in its processing." Houston, 487 U.S. at 273.  The Court determined the rules at issue "[were] not dispositive on this point, for neither Rule set[] forth criteria for determining the moment at which the [filing] has occurred." Id.  Thus, given the reading of the applicable rules as well as policy concerns for pro se prisoners, the Supreme Court held a pro se prisoner's notice of appeal is "filed" at the time it was delivered to prison authorities for forwarding to the specific court's Clerk's Office.[23] Id. at 276.

Five years after Houston, the Supreme Court again addressed the prison mailbox rule in Fex.  507 U.S. 43.  The Petitioner in Fex was in prison in Westville, Indiana when he was charged with other crimes in Jackson County, Michigan. Id. at 46.  The prosecuting attorney in Michigan lodged a detainer against the Petitioner pursuant to the Interstate Agreement on Detainers ("IAD"). Id.  The Petitioner gave his request for final disposition to prison officials for mailing on September 7, 1988. Id.  Prison officials mailed the request for final disposition of the Michigan charges on September 22, 1988. Id.  It was received by the prosecuting attorney and the Jackson County Circuit Court on September 26, 1988. Id.  The Michigan trial began on March 22, 1989, 177 days after the Petitioner's request was delivered/received by the prosecuting attorney and the Jackson County Circuit Court office, and 196 days after the Petitioner provided his request to Indiana prison officials. Id.  Article III(a) of the IAD stated that when a detainer has been lodged against a prisoner, such prisoner "shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition." Id. at 45 n.1.

The Fex Court focused on the phrase "within one hundred and eighty days after he shall have caused to be delivered" to determine whether the trial was timely under the IAD. Fex, 507 U.S. at 45-47.  Specifically, the Supreme Court examined whether the phrase referred to the date that  the prisoner gave his notice to prison authorities or the date on which the notice was received by the appropriate party. Id. at 47.  The Court found the phrase "caused to be delivered" meant delivery to the appropriate party must occur. Id. at 47, 49.  Therefore, the Supreme Court held the time period in Article III(a) of the IAD does not commence until the

---

[23] After Houston, the prison mailbox rule was codified in the Federal Rule of Appellate Procedure.  See Fed. R. App. P. 25(a)(2)(A)(iii).  Of note, the prison mailbox rule was not codified in the Vaccine Rules or RCFC.

prisoner's notice "has actually been delivered to the court and prosecuting officer of the jurisdiction that lodged the detainer against him." Id. at 52.

Since Houston and Fex, federal courts have both applied and rejected the prison mailbox rule in various contexts. See, e.g., Sharpe, 111 Fed. Cl. at 336-37 (citing cases that have applied the rule and finding the rule applies to the Court of Federal Claims "with respect to the filing of an incarcerated pro se plaintiff's complaint"); Smith, 250 F.3d at 278 (rejecting the application of the prison mailbox rule where the applicable regulations defined the date of filing as the date of receipt); Censke v. United States, 947 F.3d 488, 490-93 (7th Cir 2020) (discussing cases that have applied and rejected the prison mailbox rule). Federal courts have interpreted "[t]he distinguishing factor [] to be the specificity of the 'service' language in the statute at issue." Longenette, 322 F.3d at 762, 765 (applying the prison mailbox rule where the applicable statute and regulations failed to "require 'actual receipt'"); see also Smith, 250 F.3d at 278 ("The Supreme Court has [] emphasized that when the language of the governing rule clearly defines the requirements for filing, the text of the rule should be enforced as written.").

## 2.    Cloer v. Sec'y of Health & Human Services

In Sebelius v. Cloer, the Supreme Court held that an untimely petition brought under the Vaccine Act "may qualify for an award of attorney's fees and costs if it is filed in good faith and there is a reasonable basis for its claim." 569 U.S. 369, 382 (2013). In reaching this holding, the Court examined the statutory language of § 11 and § 15. Id. at 376. Section 15 provided that attorney's fees and costs are available to "'any proceeding on such petition, referring specifically to 'a petition filed under [§ 11].'" Id. (quoting § 15). And § 11 "provide[d] that '[a] proceeding for compensation' is 'initiated' by 'service upon the Secretary' and 'the filing of a petition . . . with the clerk of the Court of Federal Claims." Id. (quoting § 11).

Regarding the word "filed," the Court noted that "[a]n application is 'filed,' as that term is commonly understood, when it is delivered to, and accepted by, the appropriate court officer for placement into the official record." Cloer, 569 U.S. at 376 (quoting Artuz v. Bennett, 531 U.S. 4, 8 (2000) (addressing when a habeas petition is "properly filed")). The Court concluded that the statutory text of § 15 was "clear" and "unambiguous:" "an untimely petition brought in good faith and with a reasonable basis that is filed with—meaning delivered to and received by—the clerk of the Court of Federal Claims is eligible for an award of attorney's fees." Id. at 380. Thus, they determined "the word [filed] carries its common meaning." Id. at 379.

## 3.    Application of the Prison Mailbox Rule in the Court of Federal Claims and Federal Circuit

The question of whether the prison mailbox rules applies under the Vaccine Act to the filing of a petition appears to be a matter of first impression. However, the prison mailbox rule has been applied in the Court of Federal Claims and the Federal Circuit. See Sharpe, 111 Fed. Cl. at 337-38; Bernaugh, 168 F.3d 1319; McLaron v. United States, 157 Fed. Cl. 58, 59-60 (2021). Additionally, many courts have specifically applied the prison mailbox rule to the filing of a pro se prisoner's complaint. See Sharpe, 111 Fed. Cl. at 337 (listing cases from the second,

17

fourth, fifth, and eleventh circuits that have applied the prison mailbox rule to the filing of complaints by a pro se prisoner).

## IV.    ANALYSIS

### A.    The Prison Mailbox Rule Applies to the Filing of a Paper Petition in the Vaccine Court

The undersigned agrees with Respondent that "courts must 'look at the statutory and regulatory regimes[] . . . in deciding whether to apply the [prison mailbox] rule.'" Resp. Br. at 7 (quoting Longenette, 322 F.3d at 765). The undersigned also agrees that where there are relevant statutes, rules, or regulatory schemes that provide a definition for when the applicable document is deemed filed, then the prison mailbox rule does not apply. Id. at 6 (citing, e.g., Smith, 250 F.3d at 278-79 ("The Supreme Court has [] emphasized that when the language of the governing rule clearly defines the requirements for filing, the text of the rule should be enforced as written.")). However, as described in more detail below, the undersigned disagrees with Respondent's interpretation of the Vaccine statute and rules.

With regard to the applicable statute sections here, § 11(a)(1) and § 16(a)(2), the undersigned finds they do not provide language explaining the timing of when a paper petition is deemed filed. Section 11(a)(1) of the Vaccine Act states "[a] proceeding for compensation under the Program for a vaccine-related injury or death shall be initiated by . . . the filing of a petition . . . with the United States Court of Federal Claims." Section 16(a)(2) of the Vaccine Act states that "no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset." Like the statute at issue in Houston, neither § 11(a)(1) nor § 16(a)(2) defines when a petition is deemed filed or designates with whom it must be filed. Further, § 11(a)(1) and § 16(a)(2) do not state that actual receipt of the Petition is required to effect filing.

Next, the undersigned finds the Vaccine Rules do not provide language as to when a paper petition is deemed filed.

Vaccine Rule 2 provides that a paper form of a petition must be forwarded via mail or other delivery to the Clerk at the U.S. Court of Federal Claims. This rule is similar to the applicable rules in Houston, which the Supreme Court determined "specif[ied] that the [filing] should be filed 'with the clerk of the district court,'" and, like Houston, the destination is not in dispute here. Houston, 487 U.S. at 272-73. Neither Vaccine Rule 2 nor the rules in Houston, however, specify "the moment of 'filing.'" Id. at 273. And unlike Article III(a) of the IAD in Fex, which required that a prisoner "shall have caused to be delivered," there is no similar language in Vaccine Rule 2. Moreover, Vaccine Rule 2 does not specify that actual receipt by the Clerk's office is required for filing.

Vaccine Rule 17, which the Respondent relies upon, specifically governs "serving and filing papers after the petition." Therefore, the undersigned finds this rule does not apply to the filing of a petition.

With regard to the RCFC, they "apply only to the extent they are consistent with the Vaccine Rules." Vaccine Rule 1(c). RCFC 3 indicates how an action is commenced, in almost the same wording as Vaccine Rule 2(a). <u>Compare</u> Vaccine Rule 2(a) ("A proceeding for compensation under the Vaccine Act is commenced by filing a petition with the United States Court of Federal Claims."), <u>with</u> RCFC 3 ("A civil action is commenced by filing a complaint with the court."). RCFC 3 does not contain any language defining the timing of filing, or indicate when a complaint (the equivalent of a Vaccine petition) is deemed filed. Nor does RCFC 3 contain language requiring actual receipt. Thus, RCFC 3 does not provide language defining the time that a paper complaint is deemed filed.

RCFC 5, "serving and filing pleadings and other papers," prescribes language for the filing of "pleadings," which includes a complaint. There is no equivalent Vaccine Rule related to the filing of a petition. The undersigned finds RCFC 5 is inapplicable here for two reasons.

First, RCFC 5 is broader than the Vaccine Rules because it applies to the filing of a complaint (petition) as well as filings after the complaint, whereas Vaccine Rule 17 applies only to filings after the petition. <u>Compare</u> Vaccine Rule 17 ("serving and filing papers after the petition"), <u>with</u> RCFC 5 ("serving and filing pleadings and other papers"). Because it is broader than any Vaccine Rule, and Vaccine Rule 17 specifically excludes the petition, the undersigned finds it is not "consistent with the Vaccine Rules." Vaccine Rule 1(c).

Second, there is no equivalent rule for filing a petition in the Vaccine Rules, and thus, this is a matter "not specifically addressed by the Vaccine Rules." Vaccine Rule 1(b). In a "matter not specifically addressed by the Vaccine Rules, the [undersigned] . . . may regulate the applicable practice, consistent with [the] rules and with the purpose of the Vaccine Act." <u>Id.</u> In accordance with the Vaccine Rules, and the purpose of the Vaccine Act, the undersigned finds Vaccine Rule 1(b) applicable. Therefore, the undersigned is authorized to regulate the applicable practice by finding that the prison mailbox rule applies to the filing of a paper petition by a <u>pro se</u> prisoner. This finding is consistent with the purpose of the Vaccine Act. <u>See</u> <u>Rooks v. Sec'y of Health & Hum. Servs.</u>, 35 Fed. Cl. 1, 7 (1996) ("Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" (quoting H.R. Rep. No. 908 at 3, <u>reprinted in</u> 1986 U.S.C.C.A.N. at 6287, 6344)).

The undersigned agrees that "[t]he distinguishing factor appears to be the specificity of the 'service' language in the statute at issue." <u>Longenette</u>, 322 F.3d at 762, 765 (applying the prison mailbox rule where the applicable statute and regulations failed to "require 'actual receipt'"); <u>see also</u> <u>Smith</u>, 250 F.3d at 278 ("The Supreme Court has [] emphasized that when the language of the governing rule clearly defines the requirements for filing, the text of the rule should be enforced as written.").

Because there is no specificity of service language in the applicable statute or rules regarding when a paper petition is deemed filed, and because the governing statute and rules fail to clearly define the requirements for filing, the undersigned finds the prison mailbox rule applies to the filing of a paper petition in this case, consistent with <u>Houston</u>, <u>Fex</u>, and their

progeny.  See also Vaccine Rule 1(b) ("In any matter not specifically addressed by the Vaccine Rules, the special master or the court may regulate the applicable practice, consistent with [the] rules and with the purpose of the Vaccine Act, to decide the case promptly and efficiently.").

This finding is consistent with the Federal Circuit, which found the prison mailbox rule applicable.  The Federal Circuit in Bernaugh applied the prison mailbox rule to a prisoner's appeal.  Bernaugh, 168 F.3d 1319.  The Petitioner in Bernaugh filed a motion for reconsideration.  Id.  It arrived at the court on September 25, 1997, three days after the expiration of the filing deadline, and the motion for reconsideration was dismissed for being untimely.  Id.  Thereafter, the prisoner filed an appeal, which the government argued was untimely because "only a timely motion for reconsideration can toll the time for taking an appeal."  Id.  The Federal Circuit applied Houston and determined that the prisoner's handwritten affidavit indicating that he provided his motion for reconsideration to prison officials for mailing on September 20, two days before the filing deadline, rendered his motion for reconsideration timely, and as such, his appeal was timely.  Id.

The Court of Federal Claims has also adopted the prison mailbox rule.  In Sharpe, pro se inmates filed a complaint against the United States on May 6, 2013 in the Court of Federal Claims, which was dismissed for lack of subject matter jurisdiction.  Sharpe, 111 Fed. Cl. at 335.  After the case was dismissed, they were ordered to pay their outstanding balance of $50.00 (because the filing fee increased by $50.00 on May 1, 2013).  Id.  The Plaintiffs filed a motion to quash or vacate the instruction to pay and argued that pursuant to the prison mailbox rule, the complaint should have been "considered filed at the moment of delivery to prison authorities," which was April 30, 2013.  Id.  The Court of Federal Claims held that based on Houston and Bernaugh, as well as "the national trend toward applying the prison mailbox rule to all filings by incarcerated pro se litigants at the trial court level, . . . the prison mailbox rule is applicable in [the Court of Federal Claims] with respect to the filing of an incarcerated pro se plaintiff's complaint."  Id. at 337 (emphasis added).  Therefore, because the evidence supported a finding that the prisoners placed the complaint in prison officials' hands on April 30, 2023, the court deemed the complaint filed on April 30, 2023.  Id. at 338.

The Court of Federal Claims also addressed the prison mailbox rule in McLaron, in the context of a pro se prisoner's appeal.  McLaron, 157 Fed. Cl. at 58.  The court entered judgment dismissing the case on July 9, 2021, which triggered deadlines to file a motion for reconsideration (by August 6, 2021) and a notice of appeal (by September 7, 2021).  Id. at 59.  The McLaron Court noted precedent in the court and the Federal Circuit applying the prison mailbox rule, and chose to also apply the rule, deeming the motion for reconsideration filed on the date in which the prisoner provided such motion to prison officials.  Id. at 59-60 (citing Bernaugh, 168 F.3d 1319; Sharpe, 111 Fed. Cl. 334).

Thus, because the Vaccine Act and Vaccine Rules do not provide "specificity of [] 'service' language" for when a paper petition is deemed filed and fail to clearly define the requirements of filing, the undersigned finds the prison mailbox rule applies to the filing of a

paper petition in this case.[24]  This finding is consistent with <u>Houston</u>, <u>Fex</u>, and their progeny.

**B.    <u>Cloer</u> Does Not Prohibit Application of Prison Mailbox Rule**

Although neither party referenced <u>Cloer</u>, the undersigned finds it appropriate to address the question of whether its holding affects the application of the prison mailbox rule.  The question in <u>Cloer</u> was whether the Vaccine Act permitted an award of attorney's fees and costs in a proceeding on an unsuccessful vaccine injury petition.  The petition was unsuccessful because it was filed outside the Act's statute of limitations.  The Supreme Court reviewed the Act's requirements for obtaining fees under § 15 and § 11.  Section 15 provides that attorney's fees and costs are available to "'any proceeding on such petition, referring specifically to 'a petition filed under [§ 11].'"  <u>Cloer</u>, 569 U.S. at 376.  Section 11(a) provides that "[a] proceeding for compensation under the Program for a vaccine-related injury or death shall be initiated by . . . the filing of a petition" along with other documents "with the United States Court of Federal Claims."  <u>Id.</u>  The Court explained that the word "filed" is interpreted "in accordance with [it's] ordinary meaning."  <u>Id.</u>  Thus, the Court determined that a petition is "filed . . . when it is delivered to, and accepted by, the appropriate court officer for placement into the official record."  <u>Id.</u>  The Court continued, "[w]hen this ordinary meaning is applied to the text of the statute, it is clear that a[] [] petition which is delivered to the clerk of the court, forwarded for processing, and adjudicated in a proceeding before a special master is a 'petition filed under section [11].'"  <u>Id.</u>  The fact that the petition was subsequently dismissed due to its untimely filing did not "nullif[y] the initial filing."  <u>Id.</u>  Thus, in <u>Cloer</u>, the Supreme Court held that under the Vaccine Act, "the word [filed] carries its common meaning.  That 'no petition may be filed for compensation' after the limitations period has run does not mean that a late petition was never filed at all."  <u>Id.</u> at 379.

In <u>Cloer</u>, the Court did not analyze the Vaccine Act and Rules for the purpose of evaluating whether a <u>pro se</u> prisoner timely filed a petition.  Further, <u>Cloer</u> did not address criteria for determining the moment in time at which a "filing" occurs under the Act as articulated by <u>Houston</u>.  <u>See Houston</u>, 487 U.S. at 272-73.  The holding in <u>Cloer</u> was specific to the context of evaluating criteria for eligibility of attorney's fees and costs.  Therefore, the undersigned finds <u>Cloer</u> does not prohibit application of the prison mailbox rule set forth in <u>Houston</u> and <u>Fex</u>.

**C.    Petitioner's Petition Was Timely Filed Under the Vaccine Act**

**1.    Petitioner's "First Symptom or Manifestation of Onset" Occurred by August 6, 2019**

The Vaccine Act required Petitioner to file his claim within 36 months of the onset of the earliest symptom or manifestation of an injury.  <u>See</u> <u>Markovitch v. Sec'y of Health & Hum. Servs.</u>, 447 F.3d 1353, 1357 (Fed. Cir. 2007) (holding that "either a 'symptom' or a

_____

[24] The undersigned makes no finding as to whether the prison mailbox rule applies in other contexts under the Vaccine Act and limits the ruling to the facts and circumstances presented herein.

'manifestation' of onset of a vaccine-related injury is the first event objectively recognizable as a sign of a vaccine injury by the medical profession at large"). Therefore, before determining whether Petitioner filed a timely claim, the undersigned must first evaluate the date of onset, defined as Petitioner's "first symptom or manifestations of onset." For the reasons described below, the undersigned finds that Petitioner's "first symptom or manifestations of onset" occurred by August 6, 2019.

Petitioner received the Tdap vaccine at issue on August 5, 2019. Pet. Ex. 2 at 37-38 (ECF No. 1-4). In his petition, Petitioner alleges that his arm, shoulder, and/or hand pain/dysfunction began within 24 hours of vaccination. Petition at 2. Specifically, Petitioner stated "within (24) twenty-four hours [he] had a[n] adverse effect," and "[t]he vaccine injury happened [in] less than 24 [hours]." Id. at 2-3. This places onset on August 6, 2019 or sooner.

A finding that onset occurred within 24 hours is also supported by numerous medical records. For example, on August 19, 2019, Petitioner complained of "tingling and pins and needles [that] started occurring" after his Tdap vaccination on August 5, 2019. Pet. Ex. 2 at 22 (ECF No. 1-4). On September 4, 2019, Petitioner reported "continuous pain" in his left arm "since tetanus." Id. at 28. And on that same day, September 4, 2019, Nurse Gratz documented that onset was August 5, 2019. Id. at 29.

Additionally, when Petitioner was seen by physicians Dr. Andary and Dr. Doubek on September 2, 2021, they took a history from Petitioner, who reported that "he had a tetanus shot in August 2019 and [] his left lateral elbow pain became worse the day after." Pet. Ex. 2 at 57 (ECF No. 1-4). This is the first history by a physician and a specialist. And the history given by Petitioner to his physicians that day is consistent with the totality of the medical records that place onset within 24 hours of vaccination, or by August 6, 2019.

There are two entries in the medical records that are inconsistent. On August 19, 2019, Nurse Linderman documented the date of onset as August 11, 2019. Pet. Ex. 2 at 22 (ECF No. 1-4). However, the balance of the note for that date suggests that Petitioner had been symptomatic before that date. Nurse Linderman wrote Petitioner "[r]eports getting Tdap 8/5/19, tingling and pins and needles started occurring." Id. Nurse Linderman also quoted Petitioner stating, "I got a tetanus shot on 8/5/19 and I've been having lasting pain in the arm with tingling and burning sometimes." Id. And Linderman noted Petitioner "complain[ed] of lasting pain in L[eft] arm from Tdap injection given on 8/5/19." Id.

The other inconsistent note is dated November 30, 2019, by Nurse Ruggiero, which documented the date of onset as August 9, 2019. Pet. Ex. 2 at 33 (ECF No. 1-4). The same record, however, also stated, "Patient states that he has been having pain in his left deltoid since his tetanus shot in August." Id. "Since" is defined as "at a time in the past after or later than" or "from the time in the past when." Since, Merriam-Webster, https://www.merriam-webster.com/dictionary/since (last visited Oct. 2, 2023).

Overall, the complete medical record overwhelmingly identifies the onset date to be by August 6, 2019. Given Petitioner's allegations in his petition, which are consistent with the majority of the medical records including the history taken by Dr. Andary and Dr. Doubek, the

undersigned finds that the first manifestation of Petitioner's alleged vaccine-related injury was pain, which he experienced within 24 hours of vaccination, or by August 6, 2019.

### 2.   Petitioner's Petition Was Timely Filed Before the Expiration of the Statute of Limitations

Next, the undersigned must determine whether the petition was timely filed given Petitioner's "first symptom or manifestations of onset" date of August 6, 2019.[25]

Here, because Petitioner experienced symptoms by August 6, 2019, he had 36 months after August 6, 2019, or until August 8, 2022,[26] to file his petition. Applying the prison mailbox rule, the petition in this case is deemed filed at the time it was delivered to prison officials for forwarding to the Clerk at the Court of Federal Claims. Here, this date is not specifically known based on the evidence. The evidence shows that the envelope containing the petition was stamped by the United States Postal Service on August 5, 2022. Thus, Petitioner must have delivered it to prison officials on or before August 5, 2022.[27] This date occurred prior to the expiration of the statute of limitations, which was August 8, 2022. Therefore, the petition was timely filed within the 36-month limitations period.

## V.   CONCLUSION

The undersigned finds that the petition was timely filed on August 5, 2022. Respondent shall file a status report indicating whether any medical records remain outstanding **by Wednesday, November 15, 2023**. Petitioner shall indicate whether he intends to hire an attorney[28] **by Friday, December 15, 2023**. The Clerk's Office shall provide Petitioner with a list of Vaccine Attorneys.

---

[25] Even assuming that onset occurred on August 5, 2019, the date of vaccination, does not change the outcome. If onset occurred August 5, 2019, Petitioner's statute of limitations expired on August 5, 2022.

[26] According to Vaccine Rule 19 for computing time, "if the last day [of the period] is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." Vaccine Rule 19 (a)(1)(C). Here, the expiration of 36 months after onset lands on a weekend (Saturday, August 6, 2022). Thus, the undersigned finds Petitioner's deadline was moved forward to "the next day that is not a Saturday, Sunday, or legal holiday," which was Monday, August 8, 2022.

[27] Again, the undersigned does not find Respondent's arguments as to this point persuasive because this is evidence Petitioner delivered his petition prior to the filing deadline. See supra note 21; Resp. Br. at 8-9.

[28] The Vaccine Act provides for an award of fees in a majority of cases, regardless of whether the petitioner prevails. See Guidelines for Practice Under the National Vaccine Injury Compensation Program (Apr. 24, 2020), https://www.uscfc.uscourts.gov/vaccine-guidelines.

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Special Master